# EXHIBIT
# 1

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION


ROBERT HARVEY,                                    Case No. 3:25-cv-58

      Plaintiff

        vs.

WILLIAM ROY, in his individual capacity;

and

CITY OF GALVESTON

aka

GALVESTON FIRE DEPARTMENT,

      Defendants


EXPERT REPORT OF KELLY COUCH

February 5, 2026

In compliance with Rule of Civil Procedure 26(a)(2), I hereby certify that this report is a complete and accurate statement of all my opinions set forth to a reasonable degree of probability, and the basis for the reasons for them which I testify under oath.

_____

Kelly Couch

Exhibit
Couch - 04/07/2026

**2**

### I.    Introduction:

I am the sole Owner/Manager of Couch Consulting LLC, providing consulting and expert witness services based in McMinnville, Oregon. I regularly contract with Titan National Consulting Group LLC, an expert witness group, providing expert witness services for clients through Titan National. Titan National Consulting manages all billing matters and compensates me at an agreed hourly rate and retains a portion of fees collected from the client. Titan National Consulting pays to have me listed on expert witness websites and offers referrals if cases fall within my area of expertise. The opinions in this report are mine alone and reflect information available at the report's completion date. All materials reviewed are listed in Exhibit A. If additional information is provided, I reserve the right to supplement this report to modify any opinions that may be impacted by new or additional evidence.

I have been retained by Benjamin Campagna of the Texas Attorney Group, PLCC to provide expert testimony regarding the case of Robert Harvey vs. Fire Chief Wiliam Roy and the City of Galveston. I have been asked to provide opinions about a collision between an on-duty emergency vehicle operated by Galveston Fire Chief William Roy and pedestrian Robert Harvey on June 22, 2024.

### II.    Opinion Methodologies:

My opinions in this report were developed using one or more of the of the research methods listed in addition to my professional experience, training, education, and literature review. These research methodologies may have included Historiography[1], Content Analysis[2], Case Study[3], Discourse Analysis[4], and Ethnography[5]. Throughout my career, I have consistently applied these research methodologies in various roles to gather information, conduct analyses, and to conduct investigations. Part of this analysis included comparing the actions of Chief Roy against generally accepted practices in the Firefighting and Emergency Services professions, specifically in the State of Texas. Across the country, emergency responders including firefighters follow state statutes, organizational policies, regulatory guidelines, established case law, customary

---

[1] The study of history and historical writing.
[2] The study of documents, photos, video, etc.
[3] Detailed consideration of the development of a group, situation or person.
[4] Study of written or spoken language in relation to its social context.
[5] Study of a group's culture/customs

EXHIBIT A

methods, and widely recognized best practices.  I formed my opinions by reviewing case specific materials and relying on my experience in law enforcement, investigations, emergency scene management, emergency vehicle operations training and typically accepted emergency response and emergency vehicle operations standards and practices.

Note: Although I am currently employed as a part-time Tactical and Emergency Vehicle Operations Instructor for the State of Oregon Department of Public Safety Standards and Training (DPSST), the opinions in this report are not related to my current employment in that capacity. My opinions are formed from the entirety of my experience as a law enforcement officer, investigator and law enforcement trainer and on specific policies, training, and state law specific to where the incident occurred and the generally accepted practices in that state or region.

### III.    Background and Experience

I have been involved in law enforcement, investigations, safety, law enforcement training and emergency vehicle operations in several different capacities since 1989. In most of these roles I have had the responsibility to manage or assist in the management of emergency scenes of various types to include law enforcement operations, crime scene management, fire department operations, emergency medical care scenes, rescues, hazardous material incidents, natural disasters and others. I have had to coordinate with other emergency responders, maintain scene safety, interact with the public and at times take the lead role in managing emergency scenes. I have been involved in hundreds of these incidents over the course of my career in public safety. Since 2016 I have been involved in training emergency vehicle operators. I served as the full-time Lead Emergency Vehicle Operations Instructor for a state-wide training facility for six years and continue currently as a part-time instructor since retiring from my full-time position in 2012. During my time as a police officer I have investigated hundreds of traffic collisions from those resulting in minor property damage to those involving the death of drivers, passengers and pedestrians utilizing specialized accident investigation training provided by the State of California Commission on Peace Officer Standards and Training (POST) and my experience.

Since 1989 and I have held the following positions:

- 2022-Present: Oregon Department of Public Safety Standards and Training: Part-time Tactical Instructor / Emergency Vehicle Operations Instructor

- 2016-2022: Oregon Department of Public Safety Standards and Training full-time Tactical Instructor / Emergency Vehicle Operations Lead Instructor

- 2013-2016: State of Oregon Department of Human Services: Investigator 3 - Office of Adult Abuse Prevention and Investigation

- 2013-2015: Licensed Private Investigator - Self Employed Private Investigator

- 2001-2012: City of Brentwood California Police Officer
  - 2001-2003: Patrol Officer
  - 2002-2005: Field Training Officer
  - 2005-2009: Major Crimes Unit Detective
  - 2009-2012: Patrol Officer
  - 2002-2012: Department Lead Medical Trainer

- 1999-2001: Town of Moraga California: Police Officer

- 1992-1994: Contra Costa County Sheriff's Department: Reserve Deputy Sheriff

- 1989-1999: Saint Mary's College of California: Public Safety Officer and Sergeant

Since August 2022 I have been employed as a part-time Emergency Vehicle Operations Instructor by the State of Oregon Department of Public Safety Standards and Training (DPSST). DPSST is a state-wide training facility training all Oregon police officers and providing in-service training to both police officers and firefighters. As a part-time Instructor I provide skills-based training, classroom training and facilitated discussions and scenario-based training to police recruits like the duties I have listed below from my full-time employment with the agency. I regularly provide skills-based driver training to include evaluation and coaching of drivers to diagnose problem areas and correct them to develop proficient public safety vehicle operators.

Between 2016 and 2022, I was employed full-time by DPSST as a Tactical Instructor and as the Emergency Vehicle Operations Lead Instructor. My primary assignment at DPSST

EXHIBIT A

starting in 2017 was as the Lead Emergency Vehicle Operations Instructor. I regularly provided classroom training, facilitated classroom discussions, scenario training and skills training to police recruits and in-service training to current officers state-wide. I was instrumental in the development and amending of the state-wide emergency vehicle operations and pursuit management curriculum. I continually evaluated and amended both classroom presentations and track exercises to provide updated and relevant training to recruits. I was often contacted by constituents state-wide with questions about emergency vehicle operations and state standards related to emergency driving and pursuit management. I evaluated officers in pursuit scenarios and provided feedback on tactics and the use of force including the use of "Stop Stick" tire deflation devices, and other methods to safely bring pursuits to an end. I am also a Pursuit Intervention Technique (PIT) Instructor. During classroom training sessions I facilitated discussions in vehicle pursuit and emergency driving case law, video reviews of vehicle pursuits and emergency responses, relevant state law and law enforcement legitimacy regarding pursuit incidents. I facilitated discussions on this topic over 100 times.

In my role as the Lead Emergency Vehicle Operations Instructor, I regularly interacted with the state Fire Training program in a variety of capacities. The Fire Training division regularly utilized our driving course facilities to conduct in-service training for firefighters utilizing our concrete "skills pad" area for both large vehicle placement exercises and for operating the fire training vehicle attached to a "Skid-Truck" training platform. The Skid-Truck is a large steel frame that attaches to the undercarriage of a class 7 or class 8 firefighting vehicle and allows for the adjustment of the grip of the front or rear tires independently. This allows for training firefighters in the loss of grip in controlled conditions even on dry pavement. I have operated the fire training Skid-Truck personally and ridden with the Fire training team during the operation of this vehicle on several occasions.

Between 2013 and 2016 I was employed by the State of Oregon Department of Human Services as an Investigator for the Office of Adult Abuse Prevention and Investigations (currently the Office of Training Investigation and Safety). In this role I completed thorough investigations of allegations of abuse and neglect of people with physical disabilities, adults

with developmental disabilities or mental illness. This included interviews with alleged victims, witnesses, responsible parties, physicians, and others involved in the treatment of the patients. These investigations required a review of evidence from a variety of sources including medical and psychiatric records, video surveillance review, patient treatment plans, interviews of alleged victims and witnesses, chart notes and other sources. At the completion of these investigations, I drafted detailed and accurate investigative reports of my findings.

Between 2005 and 2009 I served as a Detective in the Major Crimes Unit of the Brentwood California Police Department. In this capacity I investigated a variety of types of crimes including homicides, unattended deaths, robberies, felony assaults, sex crimes and numerous others. The last two years of my assignment I functioned as the lead Detective for all homicide, unattended deaths, and violent crimes cases. During my assignment I investigated or assisted in the investigation of dozens of violent crimes including homicides, assaults, and weapons violations. I often worked closely with Fire Department personnel at crime scenes and other emergency scenes including Fire Department command staff and maintained crime scene integrity. I was required to complete detailed and accurate reports and search warrant affidavits when necessary. I served numerous warrants and collected evidence based on these warrants. I worked closely with the District Attorney's office in presenting the most serious cases in person for review of criminal charges. I was often required to testify in court based on my investigations. In 2009 after completing my assignment as a Detective I returned to the patrol division where I resumed the duties of a patrol officer as indicated below, before retiring in 2012.

From 2002-2005 I served as a Field Training Officer for the City of Brentwood, California Police Department where I was assigned to assist in the training of newly hired Police Officers. These trainees included both new officers directly from the law enforcement training academy and seasoned officers with many years of experience. In addition to providing training, coaching and guidance to new officers I also functioned as their direct supervisor and gave preliminary approval of their written crime and incident reports. I assisted assigned officers in all types of law enforcement training and mentoring including conducting investigations into a variety of types of crimes and incidents including assaults,

EXHIBIT A

thefts, death investigations, domestic violence incidents, DUI investigations, traffic incidents and numerous other criminal and non-criminal matters. I evaluated officers' performance during arrests of subjects and evaluated their use of force in affecting an arrest when necessary. I evaluated officers' driving skills including emergency response and pursuit driving.

From 2001 to 2005 and then from 2009 to 2012, I worked as a Police Officer (patrol) for the City of Brentwood, California. I held several auxiliary duties including department trainer, Field Training Officer, and Major Crimes Unit Detective as documented above. In addition to my law enforcement duties, I responded to hundreds of active emergency scenes including vehicle accidents, medical events, vehicle fires, structure fires and similar incidents. During many of these events I interacted and coordinated with other on-scene emergency personnel including Firefighters, Paramedic and EMT units, ambulances, Air Ambulance crews, HAZMAT personnel and Fire Department command personnel. I was often required to communicate and coordinate with Fire Department personnel and command staff to ensure scene safety, move citizens from unsafe areas and establish safe perimeters at emergency scenes. In addition to my duties as a patrol officer, I acted as the department's lead medical trainer from 2002 until 2012. I provided in-service training in First-Aid, CPR, AED and bloodborne pathogens to the entire department including non-sworn staff.

Between 1999 and 2001 I was employed as a Police Officer for the Town of Moraga California. My duties as a police officer included proactive patrol and response to call for service. My duties were like those listed above including the arrest of violators, emergency response and pursuit of violators in vehicles, making arrests and responding to active emergency scenes where I communicated and coordinated with our local Fire Department in a variety of areas to include scene safety, perimeters and other areas similar to those listed above.

From 1992 through 1994 I served as a Reserve Deputy Sheriff for the County of Contra Costa California for the contract city of San Ramon. As a Reserve Officer in San Ramon, I was normally assigned to work as a two-person patrol unit providing police services to the

City of San Ramon. These services included both proactive patrol and response to calls for service. Calls for service often required investigation of incidents and crimes both in progress and crimes that had already occurred and responding to emergency scenes including vehicle collisions, medical calls and other incidents.

Between 1989 and 1999 I was employed as a Public Safety Officer at Saint Mary's College of California (non-sworn campus safety). My varied duties included assisting with the safety and security of students, visitors, faculty, and staff at a campus of approximately 4000 students, approximately 1600 who resided in campus housing. In addition to proactive patrol of campus grounds on foot and in a vehicle, I regularly responded to incidents both criminal and non-criminal. I investigated these incidents including information gathering, interviews of victims, suspects and witnesses, evaluation of evidence and making arrests when probable cause existed. I was promoted to night shift supervisor (Sergeant) where I was responsible for the general supervision and oversight of night shift officers and the approval of any written reports generated by officers. I regularly responded to medical emergencies and other incidents which required coordination with the local Fire Department.

IV.    **Summary of Incident and Factual Information**

On June 22, 2024, Robert Harvey and a friend were walking on the public sidewalk on 61st Street in Galveston Texas toward an area where they had seen numerous emergency vehicles including Fire Trucks and police vehicles. Harvey maintains a "YouTube" channel where he primarily records the activities of police officers and occasionally other first responders from public areas and uploads the videos to be viewed publicly on the internet. While speaking to someone in his video just prior to this incident on June 22, 2024, Harvey explained that he was exercising his First Amendment rights recording police officers in public and creating content on YouTube. Across the United States, there are many people like Harvey who engage in similar activities, primarily recording police activity from public areas, some of whom maintain a social media presence utilizing the recorded videos.

As Harvey walked towards the area of emergency vehicles he walked past a fully marked Galveston Fire Department pickup truck which was parked in the right lane of the roadway, partially on the sidewalk blocking traffic in the right lane of the multilane roadway. The truck

had its overhead emergency lights activated. At that time Harvey was recording and live-streaming video of the scene. Traffic was flowing in the left lane towards the direction of the other emergency vehicles. The truck was operated by Battalion Chief William Roy who was seated in the driver's seat. As Harvey moved past the front of Roy's vehicle, Roy momentarily activated the siren, which appeared to cause Harvey to react abruptly, as evidenced by the sudden movement captured on Harvey's video footage. Harvey turned, walked back toward Roy's vehicle, continued to film and confronted Roy from the sidewalk while filming Roy through the closed passenger window. Harvey asked Roy, "What's your fucking problem man?" and Roy appeared to be gesturing with his right arm but made no other effort to communicate with Harvey. Harvey walked back toward the front of Roy's truck where another male was filming the emergency vehicles and Roy again sounded the vehicle siren for approximately three seconds while Harvey and the other subject stood near the front of his truck. Harvey walked back to the passenger window area and gestured at Roy with his middle finger extended, cursing at him, but Roy kept the window up and made no effort to communicate with Harvey verbally or otherwise.

Seconds later, as Harvey turned to film a firefighter walking toward him from the parking lot Roy again sounded his siren for approximately two seconds. As the unidentified firefighter walked toward Roy's vehicle Harvey stated, "He did that shit right in my ear," and the firefighter replied, "Yeah that was a little rude wasn't it?" Harvey then stated that he needed to file a complaint against Roy and raised his voice as he walked closer to Roy's vehicle and said, "Hey name and badge number man. Name and badge number." Harvey walked closer to the passenger side of Roy's truck continuing to film Roy. Roy backed the truck a short distance, stopped and turned his wheels sharply to the right, as far as they could turn based on video. At that time Harvey was standing at the front passenger side of Roy's truck just feet away based on reviewed video. Roy advanced toward Harvey, at which point an audible sound on Harvey's video suggests that an object made contact with either Harvey himself or his camera equipment. The impact caused the camera to shift abruptly from its previously stable filming position. Harvey exclaimed, "Hey man, what the fuck? He just hit me with his truck bro." Roy continued driving into the parking lot and parked his truck. Harvey immediately summoned a police officer who was on scene and told him that he had been intentionally struck by Roy's truck. As Harvey spoke with the police officer Roy turned his truck and began to exit the parking lot. As Roy drove out of the lot Harvey gestured toward Roy with his middle finger and Roy again briefly sounded his

Page **9** of **25**

siren as he exited the parking lot and drove down the roadway toward the other emergency vehicles.

### V.    Opinions Regarding Chief Roy's Actions

Consideration: Was Roy responding to an emergency call at the time of the collision?

Opinion: It is my opinion that Roy was clearly not responding to an emergency at the time of the collision between his vehicle and Harvey. Roy had been parked on what seemed to be the perimeter of the operation to locate a reported fire and was not actively involved in efforts to locate the fire which was being done by other firefighters. It is also notable that the area where Roy collided with Harvey appeared to be outside of the area of the operations of Fire personnel investigating the original call and likely was not part of the actual emergency scene. This is further evidenced by the fact that Harvey and other citizens were allowed to freely congregate in the parking lot prior to the collision. Galveston Fire Department Call logs indicate that Roy was only on the scene for a short period of time (4 minutes and 47 seconds total) and it is likely his departure from the parking lot indicates he had cleared the scene of the incident.[6]

As Roy entered the parking lot where he struck Harvey, he did not activate his siren or appear to be driving with any urgency to leave the scene or move to another position to assist with emergency operations. After driving into the parking lot, Roy parked for approximately 48 seconds before backing up and exiting the parking lot slowly approximately 30 seconds later. Roy did not activate his siren as he left except briefly as he was driving directly past Harvey when Harvey extended his middle finger toward Roy. Roy later acknowledged during his deposition that his use of the siren at that time was out of frustration with Harvey. As Roy exited the parking lot, he turned right slowly driving toward other emergency vehicles with his overhead lights on but no siren.

It was quickly determined by firefighters on scene that the fire was a small campfire that was extinguished by a local water source and five-gallon bucket of water. Most indicative of his role in the incident, a review of the Fire Department Incident Report[7] from the incident was conducted and Roy documented his involvement with the call as the incident commander. Chief

---

[6] GFD Incident #2404074 page 6 of 12
[7] GFD Incident #2404074 page 6 of 12

Page **10** of **25**

Roy's report indicates that he was dispatched to the call on 06/24/2024, at 00:12:31 and arrived on scene at 00:20:45.  Roy's report narratives states the following, "*Responded for station 4 to the reported fire, arrived on location, crews located the fire outside the structure in the back and extinguished. All crews were released.*" The report indicates his time clearing the scene as 00:25:32, for a total time on scene of 4 minutes and 47 seconds. Harvey's video of Roy at the scene covers a total of approximately four minutes from the time of his arrival until Roy drives out of the parking lot.

During his deposition Roy stated that he was moving his truck into the parking lot to try to get a closer look at the building address. When interviewed by Detective Rogers about the incident on 06/27/2024, as documented in Rogers supplemental police report[8], Rogers documented that Roy told him the following, *"Roy stated he responded to a fire in the 1800 block of 61st Street and upon arriving heard someone state that the fire was located to the south of his location behind a building which is currently under construction."* In his original written statement to Chief Olsen dated 06/22/2024, Roy documented that he was moving his truck into the parking lot to *"establish a command post."* Galveston PD Officer Watson documented Roy's statement regarding why he moved into the parking lot as follows when he was interviewed right after the incident occurred on 06/22/2024; *"Roy advised me that he was still looking for the address of the call when he hit his siren to which it startled the two pedestrians recording. Roy advised that the two pedestrians then began to yell at him and flip him off. Roy advised that after this occurred, the fire department had located where there call was to which he advised was a gas station being remodeled. Roy advised that he then began to back up his vehicle and saw both pedestrians at the front right corner of his truck. Roy advised that he then began to pull into the parking lot while turning left.[9]"* Roy has made four different statements about why he was moving his vehicle into the parking lot on the date of the incident involving Harvey, making it difficult to determine what his actual reason was. None of the reasons stated by Roy indicate that he was moving into the parking lot for any urgent reasons related to the original call.

It is my opinion based on evidence reviewed including Fire Department logs and written evidence, Roy's documented interviews with Officer Watson and Detective Rogers shortly after

---

[8] Galveston Police Supplemental Report PDD000027
[9] Galveston PD Case #24-003697

Page **11** of **25**

the incident, video evidence, deposition testimony, and Roy's known role in the original fire incident that he was not responding to an emergency at the time of the collision.

Consideration: Did Roy act with appropriate regard for the safety of Harvey and others on the scene of this incident and within the guidelines of Texas law regarding the operation of an emergency vehicle?

Opinion: It is my opinion that Roy did not act with appropriate regard for the safety of Harvey and his actions resulted in the collision between his emergency vehicle and Harvey.

Texas law defines an emergency vehicle and when it can be operated as such including the limitations and obligations of the operator.[10]  Texas law requires all emergency vehicle operators to operate their vehicles with, "*appropriate regard for the safety of all persons.*"[11] Based on the evidence reviewed in this case it is my opinion that Roy did not act with appropriate regard for the safety of Harvey in this incident.

Based on my review of evidence including scene video from Harvey, surveillance video, sworn testimony from Roy and other reviewed information, there are only two possible causes for this collision. The first is that Roy became frustrated with Harvey and turned his vehicle toward Harvey with the intent of striking him with the vehicle. There is evidence that suggests Roy's possible frustration with Harvey, but no specific evidence that Roy intentionally struck Harvey with his vehicle. Evidence of Roy's frustration includes his continued unnecessary use of his vehicle siren which seemed to be directed at Harvey and his failure to roll down his window and verbally interact with Harvey. Roy may have been frustrated that Harvey moved beyond his vehicle into an area that Roy stated during his deposition he considered to be an "active scene." Roy stated in his deposition that he did not attempt to communicate with Harvey verbally or request that he move back, instead indicating his intention solely by gesturing with a wave of his arm.  Although Roy said during his deposition that his initial intent was to sound the electronic air-horn to signal Harvey to not proceed closer to the scene and that the use of the siren was not intentional, he continued to utilize the siren three more times throughout his interactions with Harvey. Roy stated that he activated his siren with the objective of prompting Harvey to move

---

[10] Texas Transportation Code section 546
[11] Texas Transportation Code section 546.005

Page **12** of **25**

away from the scene. Roy acknowledged during his deposition that the last use of his siren as he exited the parking lot was, *"Basically a fuck you back,"* directed toward Harvey.

Siren control boxes vary in design and configuration, and it is possible errors in expected function during operation can occur. If this was the case Roy could have easily corrected the condition before sounding the siren after the first use. In his deposition Roy said he attempted to correct the siren condition but did not elaborate on why he wasn't able to do so. It is my opinion that a firefighter with Roy's level of experience operating an emergency vehicle including the lightbar and siren controller should have extensive knowledge of the operation of the siren control module and be able to easily operate it and correct any unwanted conditions. In my experience light bar control panels generally position the "air-horn" button separately from the siren controls. Most emergency vehicles have a public address (PA) function allowing the operator to address people outside the vehicle verbally. Without looking at the specific controller utilized in Roy's vehicle I can't opine how this reported error occurred or if Roy's vehicle had a PA system he could have utilized. Following the initial sounding of the siren, Harvey had multiple interactions with Roy, during which he used profane language and made inappropriate gestures toward Roy. These actions may have contributed to Roy's increased frustration.

Having worked hundreds of emergency scenes throughout my law enforcement career, many of which included Firefighters and other emergency responders, I know that people entering active emergency scenes can be the source of frustration for emergency responders. Although emergency responders including firefighters and police officers always strive to remain professional, composed and unaffected by these incidents, I have seen some lose their composure and react to these incidents in an unprofessional manner as Roy did when he sounded his siren as he exited the parking lot. Another aspect that may suggest the act was intentional is Roy's decision to continue moving his vehicle forward, despite his deposition testimony stating he could plainly see Harvey standing in close proximity to the front of his vehicle, thereby creating a hazardous situation as he proceeded.

The other possible cause of the collision between Roy's truck and Harvey is that Roy operated his vehicle with a reckless disregard for the safety of Harvey who was clearly visible and within the path of Roy's vehicle as he entered the parking lot. The collision occurred during hours of darkness, but otherwise weather conditions were clear and the area including the parking lot was

well-lit by streetlights, lighting from the businesses, the illuminated business sign and Roy's emergency lights and vehicle headlights. Harvey was wearing a bright yellow tee shirt and just prior to Roy moving his vehicle forward from the roadway into the parking lot Harvey was standing directly within Roy's line of sight near the passenger side front headlight. Roy acknowledged during his deposition that he saw Harvey wearing a brightly colored shirt. Video from Harvey and surveillance video depict there were no other significant obstacles or pedestrians in the area that likely would have distracted Roy as he continued his forward path of travel into the parking lot. Video from Harvey clearly shows that Roy is visible through the windshield with a direct line of sight to Harvey throughout his forward movement.[12]

As Roy began turning into the parking lot Harvey was clearly within his path of travel which Roy confirmed during his deposition. Surveillance video depicts that as Roy began his turn it appears that Harvey was walking slowly forward with his tripod in his right hand but then quickly sidestepped to avoid Roy's truck as it moved forward.[13] In my review of evidence for this case, I reviewed Detective Rogers' supplemental report regarding the incident. In an entry dated 06/27/202, at 9:30am, Rogers documents that he reviewed surveillance video from the parking lot where the collision occurred. Rogers report states, *"In viewing the video it is obvious to me that Unit 2346 does not strike the body of Robert Harvey. Robert Harvey has a tripod between himself and Unit 2346 and it does not appear there is damage to the tripod belonging to Robert Harvey either."*[14]  I have reviewed this same video numerous times and the live-streamed video from Harvey disagree with Rogers' assessment that no portion of Harvey was struck. Although it is difficult to determine exactly where Harvey was struck, there is evidence that contact was made between Roy's vehicle and Harvey. This includes the sudden movement of Harvey's camera, the audible sound clearly heard in his video and the movement of his feet in the surveillance video.

In Roy's written statement addressed to "Chief Olsen" dated 06/22/2024, Roy admitted that he saw Harvey standing near the right front corner of his vehicle. Roy's statement documents, *"As I was making the turn into the parking lot the male wearing the yellow shirt was standing near the front right corner bumper with a recording device mounted to a metal camera tripod stick. I*

---

[12] Harvey livestream video
[13] Parking lot surveillance video from 1813 61st Street
[14] Galveston PD supplemental report #PD000027- Detective Rogers

Page **14** of **25**

*could tell that he was not in my way, and I proceeded to advance forward into the parking lot."* Roy continued his turn and forward motion with Harvey standing in a position so close to his vehicle that he clearly endangered Harvey's safety.

When asked during his deposition why Roy didn't utilize his siren at that point to warn Harvey to yield to his vehicle Roy stated, *"I'm focused on getting between him and the sign and moving through into that area where I was going to park the vehicle."* In Roy's statement to Officer Watson on the date of the incident, he said that he was able to clearly see Harvey and that Harvey was *"clear of the truck."*[15] It is my opinion, based on the evidence reviewed in this case as well as my training and experience, Roy should have reasonably recognized that an individual standing in such close proximity to his vehicle while it was in motion was clearly exposed to a hazardous condition. Roy should have signaled Harvey to move out of his way or not moved his vehicle until his path of travel was clear and it was safe to move forward.

Although I do not have access to Roy's training history, during his deposition Roy said he served in various roles prior to being promoted to the position of Battalion Chief and received a great deal of training as a result. The Texas Commission on Fire Protection (TCFP) sets most of the training requirements for firefighters throughout Texas.  The TCFP provides certification curriculum for numerous areas including operation of Firefighting apparatus. A review of this publicly available information reveals that the curriculum includes extensive training in the operation of firefighting vehicles to include safety issues like utilizing good visual skills to look ahead, observing hazards and other skills when operating fire service equipment. Roy acknowledged during his deposition that he received this training throughout his career regarding the safe operation of emergency vehicles during his initial certification training and later when trained to operate engines and ladder trucks.

I am unable to determine with certainty if Roy's actions on 06/22/2024, and the subsequent contact between his vehicle and Harvey were the result of an intentional act by Roy or that Roy was driving with reckless disregard for the safety of Harvey. Roy stated that he did not deliberately strike Harvey and there is no evidence that his actions were intentional, but it is possible that because of his frustration with Harvey Roy acted with a lack of due regard for

---

[15] Galveston PD Report Case #24-003697 "Details" narrative

Page **15** of **25**

**EXHIBIT A**

Harvey's safety as he moved into the parking lot. There is overwhelming evidence that Roy is trained in the safe operation of emergency vehicles, that he has extensive experience in the safe operation of such vehicles and that he had a clear view of Harvey as he began to move his vehicle on the date of the incident. Therefore, if this was not a deliberate act, it is my opinion that Roy demonstrated reckless disregard for Harvey's safety when he moved his vehicle into the parking lot on 06/22/2024 and struck Harvey.

Should additional information not previously discovered become available, I reserve the right to supplement this opinion report based on that information.

End of opinion report. See attached exhibits below.