# EXHIBIT
# 2

**KELLY COUCH  -  April 07, 2026**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

ROBERT HARVEY,                    )
                                  )
        Plaintiff,                )
V.                                )  Civil Action No.
                                  )  3:25-cv-00058
                                  )
WILLIAM ROY, in his               )
individual capacity;              )
CITY OF GALVESTON, aka            )
GALVESTON FIRE DEPARTMENT,        )
                                  )
        Defendants.               )


REMOTE DEPOSITION

KELLY COUCH


Tuesday, April 7, 2026


11:30 a.m. - 12:51 p.m.


Job No. 197557

Reported By:  Lori A. Aldrich, RPR, RMR, CRR, CSR

**SUMMIT COURT REPORTING**
**713-581-7785**

**KELLY COUCH  -  April 07, 2026**

REMOTE APPEARANCES


For the Plaintiff:

            BENJAMIN S. CAMPAGNA, ESQ.
            TX Attorney Group, PLLC
            440 Louisiana Street
            Suite 900
            Houston, Texas 77002
            ben@txattorneygroup.com
            e-service@txattorneygroup.com


For the Defendants:

            NORMAN RAY GILES, ESQ.
            Lewis Brisbois Bisgaard Smith LLP
            24 Greenway Plaza
            Suite 1400
            Houston, Texas 77046
            Norman.Giles@lewisbrisbois.com


Also Present:

            Robert Harvey

I N D E X

EXAMINATION OF KELLY COUCH:                              PAGE
April 7, 2026

By Mr. Giles                                               4

By Mr. Campagna                                           44


                                                       INITIAL
DEPOSITION EXHIBITS:                                  REFERENCE

Exhibit 1       Notice of Intention to Take              7
                the Oral Deposition of
                Kelly Couch and Subpoena Duces
                Tecum

Exhibit 2       Expert report of Couch,                  7
                2/5/2026

4

**KELLY COUCH  -  April 07, 2026**

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

THE REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.  And I will start with plaintiff's counsel.

MR. CAMPAGNA:  Benjamin Campagna for the plaintiff; and plaintiff agrees.

MR. GILES:  Norman Giles, for the defendants; and the defendants agree.

KELLY COUCH, having been first duly sworn to state the whole truth, testified as follows:

(Deponent's reply to oath:  I do.)

EXAMINATION

BY MR. GILES:

**KELLY COUCH  -  April 07, 2026**

Q.   Okay, great.  So if you don't mind, if you go to the bottom -- although I'm not seeing it very well, if you'll go to the bottom of the depo notice, there starts a numbered list of things, and those are some -- a few things that I asked -- that I asked for you to provide to me before the deposition.  Did you see this list before the deposition?

A.   Yes, sir, I did.

Q.   And I received an email yesterday from the plaintiff's lawyer that has four items that I'm going to put up next, that he provided in response to the subpoena.  But I'm going to put -- I want to make sure that you're familiar with the questions that are on the list, the things that are asked.  And what I'm going to ask you next is, after I show you the things that were sent to me, I'm going to ask you if there are any other

**KELLY COUCH  -  April 07, 2026**

items that are responsive to this, that you didn't provide in response to the subpoena, all right?

A.   Okay.

Q.   All right.  The item that I -- that's on the screen -- are you able to see the screen now?

A.   Yes, sir.

Q.   And this is the item that the plaintiff's lawyer sent me yesterday.  It's marked with Exhibit A on the top, and then it goes through -- I'm just going to scroll through it quickly, and stop me if you need me to slow down, but I want you to see what was sent to me.

All right.  Can you tell me what it is that is on -- the thing that's on the screen now?

A.   Yes, sir.  That's my expert report for this case.

Q.   All right.  Great.  And so other than the information that's up on the screen now, is there any other information that you have that's responsive to the subpoena?

A.   No, sir.  I replied, and the materials I used are listed in Exhibit B of my expert report, in addition to my professional training and experience.

Q.   All right.  Thank you.  So the item that I have on the screen now I'm going to mark that as

**KELLY COUCH  -  April 07, 2026**

Exhibit 2.  And I'm going to mark the depo notice that I showed before as Exhibit 1, please.

(Exhibits 1 and 2, remotely introduced and electronically provided to the reporter.)

Q.  I'm not going to leave those things on the screen now, as long as you -- but you might need a copy of your report.  Do you have a copy of your report you can refer to?

A.  I do have one available, if I need to look at it, yes, sir.

Q.  Am I correct in my understanding, when I look at Exhibit 2, that things that are marked A are basically your report, and then Exhibit B are the materials that you reviewed, exhibit C is your case

**KELLY COUCH  -  April 07, 2026**

list, and Exhibit D is something of a CV; would that be an accurate characterization?

        A.    Yes, sir.

        Q.    If I understand your report, basically you presented and identified two things you called considerations, which, to me, seemed to be questions. And then basically the rest of the report deals with answering those two questions.  Is that -- is that the way you understand it as well?

                MR. CAMPAGNA:  I'm sorry, Mr. Giles.  I don't see page numbers.  You said he identified it as page 10?

                MR. GILES:  Yeah.  In his report, if you look at the bottom left-hand corner, it should have a page number on the report.

                MR. CAMPAGNA:  10.  Oh, I see, I'm sorry. Thank you.  Go ahead.

MR. GILES:  Sure.

A.  Yes.  In answer to your question, that is how I generally lay out my reports, and that is how it's laid out in this report.

Q.  (BY MR. GILES)  Okay.  And these two -- these two considerations or questions, are those the things that the plaintiff's lawyer asked you to provide an opinion about?

A.  Yes, sir.

Q.  And the -- I'm going to talk about them in reverse order, although you have them in your report where you're -- in a different order, but I'm going to do them in reverse order.

A.  Sure.

Q.  So we're starting on page 12.

A.  Okay.

Q.  And so I have the -- the first consideration.  Did Chief Roy act with appropriate regard for the safety of Harvey and others on the scene of the incident and within the guidelines of Texas law regarding the operation of an emergency vehicle.  Did I say that correctly?

A.  It sounds right.  Let me go ahead and flip to that page and make sure the verbiage is the same.

Q.  Let me just get you to go ahead and tell

**KELLY COUCH  -  April 07, 2026**

me what the first question is that you're dealing -- that you were -- well, it's in the second order, but this is the question we're looking at now.

A.   I'm sorry.  I didn't understand your question.  Are you just wanting me to reiterate what the consideration or question I was answering in this section?

Q.   Yeah.  I think what you did, in response to my other question, was say you were going to make sure I said it right.  But instead of me saying it, I'll just get you to say it.  That way I don't have to do it again.

A.   Yes, sir.  The consideration listed on page 12, reading from my report right now, is, "Did Roy act with appropriate regard for the safety of Harvey and others on scene of this incident and within the guidelines of Texas law regarding the operation of an emergency vehicle?"

Q.   All right.  And in response to that question, did the plaintiff's lawyer ask you to answer -- essentially, your answer to that question is no; is that accurate?

A.   Yes, sir.  That's my opinion.

Q.   Okay.  Now, are you providing a legal opinion?

KELLY COUCH  -  April 07, 2026

A.    No, sir.  I don't provide legal opinions. I'm not an attorney.  I just provide opinions about the particular things that I'm looking at.  And in this case, one of those was if Mr. Roy acted with appropriate regard, or in a lot of cases, we call it due regard.  And that's based on my professional training and experience as a police officer and law enforcement and emergency driving trainer.

Q.    And you're not offering your opinion for the purpose of it being a legal conclusion, then?

A.    No, sir.  I don't offer any legal conclusions.

Q.    Do you claim to be qualified to provide legal conclusions?

A.    No.  I'm not an attorney.  I'm not a licensed attorney, sir.  So, no, I don't.  I just provide my opinion.  Sometimes that is based on a particular law in a specific jurisdiction where I'm working.  In this case, Texas law uses the terminology of "appropriate regard."  A lot of cases use "due regard" related to cases of emergency driving.

So I'm just offering my opinion on if I believed the operator of the vehicle operated it with appropriate or due regard; in this case, appropriate regard.  I wouldn't call that a legal opinion, but it

**KELLY COUCH  -  April 07, 2026**

is based on, sometimes, state law or other guidelines.

Q.   Do you claim to know what the -- how the Supreme Court has defined the -- the phrase "appropriate regard for safety"?

A.   I don't have a specific knowledge of that in this case, no, sir.

Q.   And so, if you look at the actual question, there's -- and you kind of break that question down, we have the language "appropriate regard for safety."  You see that, correct?

A.   Yes, sir.

Q.   And then the other part of the question has the part "within the guidelines of Texas law regarding the operation of an emergency vehicle."

A.   Yes, sir.

Q.   Those are both legal phrases, aren't they?

A.   I don't know if I'd call it a legal phrase, but every state regulates the operation of emergency vehicles, so I just used that as a consideration when making a determination like this. So I need to know what the case or the state law says regarding the operation of an emergency vehicle.

So in this case, it would be the Texas Transportation Code 546.  So I review that and make a determination if I believe that the operator of the

KELLY COUCH  -  April 07, 2026

vehicle -- and in this case, Mr. Roy -- operated his vehicle within those guidelines.  I wouldn't call that a legal opinion.  I leave it to the court and you guys with the law degrees to figure that out.

Q.   Thank you.  And you quoted, I think, 546, but basically you're quoting a Texas statute; is that right?

A.   Yes, sir.

Q.   Okay.  But have you done any research of how that statute's been interpreted by any of the courts in Texas?

A.   No, sir.  That's not in my area of expertise.

Q.   All right.  Do you agree with me, it's the judge's role to be -- to judge the law?

A.   Oh, absolutely, yes, sir.

Q.   Do you agree with me it's the jury's job to judge the facts?

A.   Yes, sir.

Q.   Okay.  Based upon your training and experience, would it be true to say that that's why we have a -- basically, that's the function of the jury at the trial, is to judge the facts?

A.   Yes, I agree.

Q.   And when they're doing that, they do that

KELLY COUCH  -  April 07, 2026

by hearing testimony, looking at exhibits, and any other means that they get evidence admitted into trial; is that right?

A.   Yes.  Well, that's what they should be doing, yes.

Q.   And then the -- it's also the function of the jury to not only judge that evidence, but included in judging it, to weigh the evidence; is that right?

A.   Yes, sir.

Q.   Do you -- based upon your training and experience, do you believe it's your role to tell the jury how it should judge the facts?

A.   No.  Absolutely not.  I -- I'm just providing my opinion based on some specialized training and experience that I have -- I have had over the years regarding some specific questions.  So it's definitely not my role to tell them how to judge the facts.  I'm there to present my opinion based on some specialized knowledge, and then it's up to the jury or the judge to make those determinations.

Q.   What I'm going to ask you to do is look at your report, on page 12.

A.   Okay.

Q.   And what I would like -- I'm going to ask you to do is, I'm going to ask you to read what you've

**KELLY COUCH  -  April 07, 2026**

these facts.

MR. CAMPAGNA:  Objection, form.

A.   I -- I'm not sure I understand what you're looking for, Counselor.  I apologize.  But the -- in this particular case, I think that everything I put in my opinion or report, if this goes to trial, would have some relevance for a jury to make a determination.  Again, my expertise in emergency driving and emergency scenes and all that is relevant to this document and is listed in this report.  So unless I'm misunderstanding your question, I think everything in the report has some relevance for a jury to make a determination.

Q.   (BY MR. GILES)  Well, let me -- let me try to do it this way, and maybe you'll -- maybe I can do a better job of asking my question.  Let's go to, the first two lines of your report basically says -- it's where you're saying that it's your conclusion that Chief Roy did not act with due regard for the safety of Harvey, correct?

A.   Yes.

Q.   And then the next line, Texas law defines an emergency vehicle, and when it can be operated in such -- as such, including the limitations and obligations of the operator, then you've got a footnote 10, and you're citing the Texas Transportation Code; is

that correct?

A.   Yes, sir.

Q.   Okay.  Now, is it your contention that you're the only potential source of informing the jury what the Texas Transportation Code says?

MR. CAMPAGNA:  Objection, form.

A.   Well, no, of course not, sir.  I'm just -- again, every state has different definitions of emergency vehicles and limitations and responsibilities of the operator.  So I am merely stating a piece of the information that I evaluated in making this determination, and part of that evaluation was the Texas Transportation Code 546.

Q.   (BY MR. GILES)  Right.  And you understand, I'm not quibbling with you about what you did, I'm trying to ask you about your opinions you're offering.  So I'm not fighting with you, I'm just trying to understand them, all right?

A.   Yes.  I'm trying to understand your questions and answer them appropriately, so I apologize if I'm not getting what you're trying to getting at.

Q.   No, that's okay.  But if I understand your earlier answer, basically what -- whatever it was that the Texas Transportation Code section 546 says, that's something that's the judge's job to tell the jury what

it means; isn't that true?

A.   I would agree with that, yes, sir.

Q.   And so it's not your job to tell the jury what that is, is it?

A.   No, sir.

MR. CAMPAGNA:  Objection, form.

A.   Of course not.

Q.   (BY MR. GILES)  All right.  And I'm not suggesting that you are providing your report to the jury, I'm just trying to go through it piece by piece of the report.  We're going to get to the point in a minute.

A.   Sure.

Q.   And then the next -- what seems to be the next sentence is the same situation, where you again have a footnote to the transportation code; is that correct?

A.   Regarding the language in the code about appropriate regard, yes, that's correct.

Q.   So, again, that's the judge's job, not yours, right?

MR. CAMPAGNA:  Objection, form.

A.   To explain to the jury what that means, I would agree with that, yes, sir.

Q.   (BY MR. GILES)  And then the next sentence

says, Based on the evidence reviewed in this case, it's my opinion that Roy did not act with appropriate regard for the safety of Harvey in this incident.

And that -- again, that's your conclusion; is that right

A.    Yes, that's my opinion, sir.

Q.    Okay.  And then -- then the next sentence, and I'm sorry I'm doing it this way, but I got to get to where I can ask the right question.

A.    Sure.

Q.    Not that you're -- Based on my review of evidence, including scene video from Harvey, surveillance video, sworn testimony from Roy, and other reviewed information, there are only two possible causes for this collision.  Is that what you wrote?

A.    Yes.

Q.    Now, again, do you believe you're qualified to be able to provide a legal opinion regarding the causes for this collision?

A.    I believe I'm qualified --

MR. CAMPAGNA:  Objection, form.

A.    -- to provide an opinion about the cause of this collision, based on my professional training and experience, yes.  I wouldn't call that a legal conclusion, I would call it a -- an opinion about what

happened.

Q. (BY MR. GILES) All right. And so what is your standard that you're using for the word "cause" in this sentence?

A. The -- the standard -- well, I wouldn't call it a standard. I think I'm relying on my experience as a police officer investigating traffic collisions, my experience as an emergency vehicle operations trainer to try to determine, based on the evidence that I would have, what potentially might have caused that collision. So it's based on my professional training and experience that I have.

Q. But tell me what "cause" means to you, as you used it in this sentence. What's the definition of "cause"? What's the standard for "cause"?

A. Well, I think the -- I don't -- I'm not going to opine on a legal definition of the word "cause." I think this collision resulted from two possible scenarios, and that's what I lay out in the opinion report.

Q. Okay. So let's go to the first -- well, let's deal with the part of this sentence before we get to the -- to the "cause" language. And then, Based on my review of scene video from Harvey -- now, could the jury evaluate the scene video from Harvey?

21

KELLY COUCH  -  April 07, 2026

A.    I imagine they would, yes.

Q.    Does the -- does the jury need you to tell them what the scene video from Harvey shows?

A.    No.  I imagine they don't need me for that, no.

Q.    Then you list surveillance video.  Could the jury look at the surveillance video on its own?

A.    Sure, yes.

Q.    Sworn testimony from Roy.  Could the jury consider sworn testimony from Roy?

A.    Yes.

Q.    And they don't need you to do that, do they?

A.    No, sir.

Q.    Now we go to the next sentence.  First is that, Roy became frustrated with Harvey and turned his vehicle toward Harvey with the intent of striking him with the vehicle.  Is that what you wrote?

A.    Yes.

Q.    And you reached that conclusion by looking at these -- do I understand correctly, you -- that was your conclusion after looking at the video, the surveillance video, and listening to Roy; and then based upon that information, and other information you reviewed, that's basically your conclusion about what

713-581-7785

KELLY COUCH  -  April 07, 2026

that evidence is.  Is that right?

A.   Yes, that's my opinion about one of the possible causes of why this collision occurred.

Q.   But isn't -- again, isn't that kind of conclusion basically you usurping the judge -- the jury's role?

MR. CAMPAGNA:  Objection, form.

A.   No, sir.  I'm pretty clear on my role here in these cases.  I'm not trying to come to any legal conclusion.  I understand that is the role of a judge or a jury, to make a determination about what happened. My role is to provide my opinion based on my own specialized training and experience.  So I am not trying to go make a judgment about what happened.  I'm just providing my opinion, which is based on specialized training and experience that I've had.

Q.   (BY MR. GILES)  Well, let me -- it looks to me like what you've done in that sense we just -- that we're just talking about, is you -- you're judging the facts.  And so what I want you to do for me, please, is I want you to -- you understand here, when I say I think you're judging the facts, not providing an independent opinion?

And so what I -- what I'm asking you to do is, other than looking at these recordings, tell me

what process you went through to come up and convert this -- your analysis of the facts beyond evaluating what the evidence is.

A.   Well, again, I have -- as I stated earlier, it's also based on my specialized training and experience as both a police officer and an emergency vehicle operations trainer.  So I have utilized my specialized training and background to review evidence, which I did as a police officer and as a detective and a traffic collision investigator over the years, to come to that conclusion.  So it's based on the evidence I reviewed and my own professional background and training and experience.

Q.   Now, the next sentence says, There is evidence that suggests Roy's possible frustration with Harvey, but no specific evidence that Roy intentionally struck Harvey with his vehicle.  Did you -- is that your opinion?

A.   I think there's -- yes.  I mean, there's some evidence that there was -- that Roy was frustrated with Harvey at the scene.  But, yes, I can't make a determination conclusively whether him turning the vehicle in that direction and striking Mr. Harvey was intentional.

Q.   And the next sentence says, Evidence of

KELLY COUCH  -  April 07, 2026

Roy's frustration includes continued unnecessary use of his vehicle's siren, which seemed to be directed at Harvey, and his failure to roll down his window and verbally interact with Harvey.  Did I read that correctly?

A.   You did, sir.

Q.   And tell me how your recitation of that conclusion is a helpful opinion to the jury, that the jury could not get by its own evaluation of the exact same evidence that you've looked at.

A.   Well, again, I'm just stating the information and the facts that I reviewed, and documenting those things in this opinion report.  The jury can make that determination on their own, but it also plays into why I have formed an opinion.  So it's important that I document that in my opinion report.

Q.   And I agree that what -- I mean, that's -- I agree with you that what I'm seeing is you writing down the facts that you analyzed; and that's, of course, appropriate for an expert, right?

A.   Sure.

Q.   Okay.  But -- but what my question is, after -- in addition to writing down the facts that you analyzed, what I'm looking for is somewhere in here where there's actually an opinion that is necessary

KELLY COUCH  -  April 07, 2026

from you for the judge -- for the jury to be able to judge the facts.

And so now, if you'll -- if you can look at the rest of the -- this section and point out for me somewhere in your report, anywhere in your report where you -- you provide an opinion that the jury needs, as opposed to just reciting what the facts are.

A.   Well, I think you just read that a few moments ago.  The opinion would be that based on my analysis of this incident, there were probably -- there are two possible causes that the collision occurred.  That's one of the opinions that I've laid out in the report.

Q.   Okay.  Which -- which sentence -- tell me where -- what line that is.

A.   Well, on page 12, where you -- I think you read a sentence earlier, Based on my review of evidence, including scene video, surveillance video, sworn testimony from Roy and other information, there are only two possible causes for this collision.

Q.   Okay.  So your opinion, then, is that there's two causes for the collision, okay.  So let's -- so where are the -- point me now to where the causes -- or where those two causes are in your report.  Which line of the report is it where you give an

opinion about what the two causes are?

A.    The next line.  The first is that Roy became frustrated with Harvey and turned his vehicle toward Harvey with the intent of striking him with the vehicle.  There is the first.

Q.    Okay.  And so, what analysis did you go through in reliably linking the facts to that opinion?

A.    Well, I -- I analyzed the physical evidence, the statements from Chief Roy, documentary evidence related to the incident, including written documents.  And then, again, using my own experience as an investigator, made that determination based on all the information that I've listed that was reviewed for this case.

Q.    So if I understand what I'm -- what I think I'm hearing is, basically it's your subjective analysis of the information is what gets you to the opinion; is that right?

MR. CAMPAGNA:  Objection, form.

A.    Essentially, yes.  I think I would agree with that statement.  Me analyzing all of the information available to me is how I form an opinion in any case, yes.

Q.    (BY MR. GILES)  All right.  So where -- can you direct me, please, in your report, to the

**KELLY COUCH  -  April 07, 2026**

second possible cause, other than the first one you just gave us?

A.   On page 13, the bottom of the page, last -- beginning of the last paragraph would be the next possible cause of the collision.

Q.   I'm sorry.  The 13, bottom of the page? I'm sorry --

A.   Yeah.  The beginning of the last -- the beginning of the last paragraph.  "The other possible cause of the collision."

Q.   Okay, great.  So read that for me, please.

A.   "The other possible cause of the collision between Roy's truck and Harvey is that Roy operated his vehicle with a reckless disregard for the safety of Harvey, who" -- "Harvey, who was clearly visible and within the path of Roy's vehicle as he entered the parking lot."

Q.   What's the definition of the phrase "reckless disregard for safety"?

A.   Well, I think you're asking for a legal opinion now.  I can't provide that, but I can tell you that I think -- I think he is -- his actions were clearly disregarding the safety of Mr. Harvey and others who were on scene.  And, you know, "reckless" has differing opinions, I guess, legally, than maybe --

in different states, even, for instance, as a police officer, we have -- in California, we had reckless driving, and there was specific definitions of that.  I can't provide you with a specific legal definition of "reckless disregard."

Q.   Okay.  So look for -- apologize for that.  I can turn this one off, too.  I have too many telephones here.  Apologize for that.

All right.  So we got the two places where we have an opinion from you as to this particular question, again, for the appropriate regard for the safety of Harvey.  Tell me anywhere else in your report where you provide an actual opinion that the jury needs to hear to be able to judge the facts.

A.   Well, I think there is a couple of sections in here related to the information, and they both have the Consideration and then the following section labeled Opinion.  So the other one, going back, I imagine, would be on page 10.  The other consideration:  Was Roy responding to an emergency call at the time of the collision?  And then an opinion there.  So that was one of the other factors that I evaluated when providing an opinion in this case.

Q.   Okay.  So let's go there, and --

A.   Page 10, sir.

Q.    Yeah, I'm with you.  I'm just trying to figure out what to ask you.

A.    Sure.

Q.    Do you know -- do you know what any Texas court has -- how they define the phrase "responding to an emergency call"?

A.    No, I don't have specific knowledge. Actually, I did some research trying to locate how Texas defined an emergency scene, but I don't have specific information about that.  It's just based on my own experience and kind of some general definitions of what an emergency scene is.  So, no, I can't -- I don't have that information.

Q.    Okay.  And, again, you're -- if I understand you correctly, and you tell me if I'm wrong, you're not claiming to be able to provide a legal opinion in response to this question, are you?

A.    No, of course not, sir.  I'm not -- yeah, I'm not an attorney.  I can't provide a legal opinion.

Q.    Okay.  And you also can't define the term as the -- as it's defined as the law in Texas, "responding to an emergency call"; is that correct?

A.    I can broadly define it, but, no, not -- I don't have specific information or knowledge, in spite of my efforts to do so.  No, I can't answer that

question specifically.

Q.   Okay.  So -- and, again, just like the first -- the first opinion that you had regarding the appropriate regard for the safety, again, it's the -- it's the jury's -- the jury has the role of judging the facts on this other opinion, too; isn't that true?

A.   Yes, of course.

Q.   So tell me, in the section here for the -- for your opinion regarding whether Roy was responding to an emergency call, in that section of the report -- beginning on page 10, it goes on until page 12, when we start the next question -- tell me where I look in your report to see your opinion -- an opinion from you that the jury needs to see to be able to evaluate the facts. And, again, I'm asking for your opinion, not just your recitation of the facts.

A.   Well, I think -- you're also asking a question of what I think the jury needs to see, which sounds like a legal question to me.  But I -- everything in the following section after opinion is my opinions about whether Chief Roy was responding to an emergency call and what was happening at the scene.  So I would say the entire section has some relevance regarding answering that question that a jury can take into consideration when they are -- if they were to

look at this case.

Q.   Okay.  Well, let's look at your section when we -- when we get to Opinion.  Let's get to the second sentence in your -- on page 10, and under Opinion.  Roy had been parked in what seemed to be the perimeter of the operation to locate a reported fire, and was not actively involved in the efforts to locate the fire, which was being done by firefighters.

So tell me your specialized abilities that allows you to evaluate that set of facts differently than the jury would.

A.   Well, I have extensive experience on emergency scenes.  I've dealt hundreds of times with firefighters on active fire scenes, and I evaluated the information based on -- that information I evaluated is not -- that's my opinion, that he did not appear to be actively involved in efforts to locate the actual fire.

I've been on many scenes with people who identify themselves as an incident commander, as Chief Roy did, and their role is different than the line firefighters or line personnel who are doing the work, generally.

Q.   What did -- what did Chief Roy say he was doing?

A.   He -- well, he said numerous things during

**KELLY COUCH  -  April 07, 2026**

the -- his deposition and at other times.  There were times he said he was acting as an incident command, and there were times later he said he was looking for an address of the fire.  And then later, he said he was aware of the location.  So I'm not sure exactly what he was doing.  It sounded, based on the information I reviewed, that he was the incident commander; and, as I recall, that's what he stated in his deposition.

Q.   Okay.  So if the jury would hear that Chief Roy testified consistent with his depo, that he actually was there, he was the incident commander, and -- do you claim to have any superior ability to prove that Chief Roy's lying about that?

A.   No, sir.  I would never say that, no.

Q.   Okay.  I mean, and so here, couldn't the jury look at the evidence and determine whether Chief Roy appeared to be parked at this particular time you're talking about in this report?

A.   Can they determine if he was parked?

Q.   Yeah.

A.   Certainly, yes.

Q.   Can they determine he was involved or not actively involved?

A.   Yeah.  Potentially, I think they can make the -- the jury can make the determination potentially

about that, yes.

Q.   And of course we've got testimony from him saying that he was actively involved; isn't that true?

A.   Yes.   At times he said he was looking for an address, and other times, yeah, there were -- he made several different statements, so it was hard for me to determine.  But, yes, at some point, he said he was looking for an address.

Q.   Is it appropriate for you to completely discredit what he said?

A.   No, sir.  I just evaluate facts; and, you know, evaluating facts when someone gives a -- differing statements, it makes it difficult for me to determine exactly what was -- what he was doing.  And I think I documented that later in my report.

Q.   Is it reliable for you to say that he -- that Chief Roy was not actively involved?

A.   I think, based on the evidence I evaluated, I -- that is my opinion, yes.

Q.   And that your opinion is contrary to what Chief Roy said; is that true?

A.   Well, in his deposition -- I don't know. Yeah, he made several different statements about -- during the course of this case, some saying he was establishing a command post, some saying he was looking

**KELLY COUCH  -  April 07, 2026**

for an address.  Some say -- another time he said he knew the location.  So I -- I can't really make a determination about what was going on there, based on the evidence and the information he provided.  It was kind of confusing.

Q.   Well, I -- well, I agree with what you just said, but that's not consistent with what you wrote down, is it?

MR. CAMPAGNA:  Objection, form.

A.   I'm sorry.  Could you ask the question again, sir?

Q.   (BY MR. GILES)  Sure, sure.  I agree with the statement that you just made that you couldn't decide whether he was or wasn't.  But you actually wrote in your report that he wasn't involved, isn't it?

A.   Yeah, based on --

MR. CAMPAGNA:  Objection.

Q.   (BY MR. GILES)  So my -- so my question is, how is it that you reach a reliable -- a reliable opinion that he was not actively involved, when there are what you call to be disputes in what the evidence is?

A.   Well, I think the disputes in the evidence are specifically what he was -- what was happening. But I think it's clear that he was not actively

KELLY COUCH  -  April 07, 2026

involved, 'cause he was parked on the scene, didn't appear to be moving his vehicle.  He didn't -- he didn't appear out of his vehicle, looking for anything. He was kind of on the outskirts of what appeared to be the actual emergency scene at the time.  So I think, based on the evidence I reviewed, that's a reasonable conclusion, that he was not actively involved in efforts to locate the fire.

Q.   But as the scene commander, would he have to be out of his vehicle to be performing scene commander roles?

A.   For incident command, no.  He -- I mean, incident commanders often aren't directly on the scene of the incident at all.  So he wouldn't have to be.

Q.   But, again, that's not the question I'm asking you, what's relevant, what facts are relevant. I'm asking you, what is an opinion -- other than saying that Chief Roy was not responding to an emergency, what -- is there any other opinion that you recited between page 10 and 12?

A.   I mean, they -- if you're asking if that -- I'm sorry.  I'm not totally clear, but I'll try to answer.  It appears that you're asking if I kind of just stated that information elsewhere in the report or there was another opinion.

But I stated at the beginning, and then I reiterate at the end of that section, the last paragraph, where I said, It's my opinion, based on reviewed -- evidence reviewed, including fire department logs and written evidence, documented interviews, et cetera, that he was not responding to an emergency call at the time.

So I would say that the beginning and end of that particular section is where I lay out that opinion.

**KELLY COUCH  -  April 07, 2026**

Q.   Thank you.  Were your opinions reached through independent research or for litigation?

A.   Well, I mean, I am retained by the plaintiff's counsel to provide an opinion about the case.  So, I mean, I didn't do independent research. I've provided all the evidence and materials related to this case so I can form an opinion about what occurred.

So my opinion is done independently.  My opinions are -- my conclusions are -- and opinions are my own.

Q.   To what extent does your analysis depend on -- oh, sorry.  I'll withdraw that one.

Can you -- can you quantify a potential rate of error of your opinions?

A.   No, I don't think -- I think that's difficult to do, sir.  I don't -- I don't know, because it's an opinion.  I -- it's difficult to quantify if my opinions are correct or incorrect.

Q.   Have your opinions in this case been subjected to peer review?

A.   No, sir, no.  These opinions are my own.

Q.   Have your opinions in this case been published?

A.   No, sir.

Q.   If -- if Mr. Harvey or his tripod was

**KELLY COUCH  -  April 07, 2026**

struck by any part of the fire vehicle, did -- did Mr. Harvey's actions contribute to the conduct -- contact?

A.    It didn't appear so in the video, and the information that I reviewed, no.  It appeared he was essentially standing in the same position.  In other words, I think you're asking if he stepped in front of the truck or something, and it did not appear that he did so.

Q.    So as far as you're concerned, Mr. Harvey had no culpability at all in being struck, if he was?

A.    Yes, that's accurate.

Q.    Can we look at your case list, please?

A.    Yes, sure.  Of course.

Q.    Have you ever worked on another case where you were asked to answer the questions that were asked in this case?

A.    Specifically -- I have, I think, opined on if someone was, let me think, acting with due regard, but I'm not -- well, I think in the Dibbern case, we did speak about operating with due regard.  And I'm still looking.  And in the Flanders versus Huntington Beach case, that was one of the questions.  And the Gomez-Serrano versus City of Seattle, that was one of the questions.  So, yes, I have talked about --

Q.    I'm sorry.  Did you say -- I'm sorry.  I thought I was taking notes, and I may have missed them. Did you say -- I got Serrano, and I got Dibbern.  Did you also say Flanders, or what was the third one?

A.    Yes.  The third one was Flanders versus Huntington Beach.  In those cases, I did answer the question of was someone responding with due regard or appropriate regard, and I think the language in that

KELLY COUCH  -  April 07, 2026

was due regard in those particular cases.

Regarding my other opinions regarding to -- regarding if he was responding to an emergency call at the time of the collision, I don't believe I've answered that question in other cases.

**KELLY COUCH  -  April 07, 2026**

Q.    Okay.  Are you offering scientific expertise?

A.    No, I wouldn't call this scientific.  I would call it expertise based on, again, my background, training and experience.  So, no, I -- scientific would

**KELLY COUCH  -  April 07, 2026**

be something entirely different, at least in my opinion.

**KELLY COUCH  -  April 07, 2026**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

ROBERT HARVEY,                  )
                                )
          Plaintiff,            )
V.                              )   Civil Action No.
                                )   3:25-cv-00058
                                )
WILLIAM ROY, in his            )
individual capacity;            )
CITY OF GALVESTON, aka          )
GALVESTON FIRE DEPARTMENT,       )
                                )
          Defendants.           )

REPORTER'S CERTIFICATE
DEPOSITION OF KELLY COUCH
April 7, 2026

I, Lori A. Aldrich, Certified Shorthand

Reporter in and for the State of Texas, hereby certify to

the following:

That the witness, KELLY COUCH, was duly sworn

by the officer and that the transcript of the oral

deposition is a true record of the testimony given by the

witness;

That the deposition transcript was submitted on

April 23, 2026, to the witness or to the attorney for

the witness for examination, signature, and returned to

me by May 25, 2026;

That the amount of time used by each party at

the deposition is as follows:

Mr. Giles:  1 hour, 2 minutes;

Mr. Campagna:  19 minutes;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following include all parties of record:

For the Plaintiff:

  BENJAMIN S. CAMPAGNA, ESQ.
  TX Attorney Group, PLLC
  440 Louisiana Street
  Suite 900
  Houston, Texas 77002
  ben@txattorneygroup.com
  e-service@txattorneygroup.com

For the Defendants:

  NORMAN RAY GILES, ESQ.
  Lewis Brisbois Bisgaard Smith LLP
  24 Greenway Plaza
  Suite 1400
  Houston, Texas 77046
  Norman.Giles@lewisbrisbois.com

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further, that I am not financially or otherwise interested in the outcome of the action.

**KELLY COUCH   -   April 07, 2026**

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 23rd day of April, 2026.

Lori A. Aldrich, RMR, CRR
CSR # 13098
Expires:  April 30, 2027
Summit Court Reporting
Firm Registration No. 62
1225 North Loop West
Suite 327
Houston, Texas 77008
713-581-7785

FURTHER CERTIFICATION UNDER RULE 203 TRCP

That the original deposition was/was not returned to the deposition officer on

_____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to _____, the Custodial Attorney;

That $_____ is the deposition officer's charges to the _____  for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein on _____and filed with the Clerk.

Certified to by me on this the _____ day of _____, 2026.

_____
Summit Court Reporting
Firm Registration No. 62
1225 North Loop West
Suite 327
Houston, Texas 77008
713-581-7785